**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

PINE BELT AUTOMOTIVE, INC.

            Plaintiff,

v.

ROYAL INDEMNITY COMPANY and
    GRANITE STATE INSURANCE
    COMPANY, MEMBER
    AMERICAN INTERNATIONAL
    GROUP, INC.

            Defendants.
_____

CIVIL ACTION NO. 06-5995 (JAP)

**OPINION**

APPEARANCES:

John J. Carlin, Esq.
Lawrence Z. Kotler, Esq.
Carlin & Wood, P.C.
25A Vreeland Road
P.O. Box 751
Florham Park, New Jersey 07932
    *Attorneys for Plaintiff*

William D. Wilson, Esq.
Mound Cotton Wollan & Greengrass
60 Park Place
Newark, New Jersey 07102
    *Attorneys for Defendant Granite State Insurance Company*

PISANO, District Judge.

This action arises from a Complaint brought by Plaintiff Pine Belt Automotive, Inc. ("Pine Belt") alleging that Defendants Royal Indemnity Company ("Royal") and Granite State Insurance Company ("Granite State") breached their insurance agreements when they denied Pine Belt coverage under their respective insurance policies. Currently before the Court is a motion for summary judgment brought by Granite State. For the reasons set forth herein, the Court grants Granite State's motion for summary judgment.

I.  BACKGROUND

  A. The Insurance Policies

Pine Belt Automotive, Inc. ("Pine Belt") is an automobile dealer with multiple dealerships located throughout Monmouth County, New Jersey. (Compl. ¶ 1.) From June 1, 2003 to June 1, 2004 Pine Belt was insured by Royal Indemnity Company ("Royal"). (*Id.* ¶ 7.) The insurance included Commercial Crime Coverage and Truth in Lending Errors and Omissions Liability Coverage. (*Id.*) Prior to the expiration of the policy on June 1, 2004, Royal informed Pine Belt that it would not renew the policy. (*Id.* ¶ 11.) Subsequently, Pine Belt purchased insurance from Granite State Insurance Company ("Granite State") who insured Pine Belt from June 1, 2004 to June 1, 2005. (*Id.* ¶ 12.) The Granite State coverage included Commercial Crime Coverage and Truth in Lending Errors and Omissions Coverage ("Truth in Lending provision"). (*Id.*) Granite State's Commercial Crime Coverage was virtually identical to Royal's policy. Specifically, the Granite State Commercial Crime Coverage provided:

  A.  Insuring Agreements

Coverage is provided under the following Insuring Agreements for which a Limit of

Insurance is shown in the Declarations:

1. Employee Theft

We will pay for loss of or damage to "money," "securities" and "other property" resulting directly from "theft" committed by an "employee," whether identified or not, acting alone or in collusion with other persons.

(Def.'s Br. Summ. J., Aff. William D. Wilson Ex. B, GB 00202.)

F. Definitions

13. "Money" means:

a. Currency, coins and bank notes in current use and having a face value; and

b. Travelers checks, register checks and money orders held for sale to the public.

(*Id.* GB 00210.)

20. "Theft" means the unlawful taking of "money," "securities," or "other property" to the deprivation of the insured.

(*Id.* GB 00211.)

Granite State's Commercial Crime Coverage was limited to $100,000 per occurrence with a $1,000 deductible. (*Id.* GB 00200.) Under Insuring Agreement A.1. occurrence was defined as "all loss caused by, or involving, one or more 'employees,' whether the result of a single act or series of acts." (*Id.* GB 00211.)

Additionally, the Granite State Commercial Crime Coverage Form contained the following exclusion for loss resulting from any dishonest act other than theft:

D. Exclusions

b. Acts of Employees, Managers, Directors, Trustees of Representatives

Loss resulting from "theft" or any other dishonest act committed by any or your "employees," "managers," "directors," trustees or

-3-

>>authorized representatives:
>>
>>(1) Whether acting alone or in collusion with other persons; or
>>
>>(2) While performing services for you or otherwise:
>>
>>except when covered under Insuring Agreement A.1.

(*Id.* GB 00203.)

>The Truth in Lending provision in the Granite State Policy provided in part:
>
>>A. We will also pay all sums the 'insured' must legally pay as damages because of the unintentional violation of any Federal or State Consumer Credit Act including but not limited to the Truth in Lending Act or other similar statute, law or ordinance, and which arises out of representations made pertaining to the lending of amounts for the purposes of purchasing or leasing any automobile.
>>
>>B. Exclusions
>>
>>This insurance does not apply to:
>
>Damages if caused by any willful, dishonest, fraudulent, intentional, or criminal act committed by the "insured," nor does it apply to any civil fines or penalties levied by any governmental agency against the "insured."

(*Id.* GB 00222.)

>Finally, the Granite State Policy covered losses sustained during a previous policy. The

policy provided:

>>E. Conditions
>>
>>The following Conditions apply in addition to the Common Policy Conditions:
>
>m. Loss sustained During Prior Insurance
>
>>(1) If you, or any predecessor in interest, sustained loss during the period of any prior insurance that you or the predecessor in interest could have recovered under that insurance except that the time within which to discover loss had expired, we will pay for it under

>   this insurance, provided:
>
>> (a) This insurance became effective at the time of cancellation or termination of the prior insurance; and
>>
>> (b) The loss would have been covered by the insurance had it been in effect when the acts or events causing the loss were committed or occurred.
>
> (2) The insurance under this Condition is part of, not in addition to, the Limits of Insurance applying to this insurance and is limited to the lesser of the amount recoverable under:
>
>> (a) This insurance as of its effective date; or
>>
>> (b) The prior insurance had it remained in effect.

(*Id.* GB 00207.)

### B. The Fraud

In October 2003, Pine Belt entered into a Dealer Agreement with First Atlantic Federal Credit Union ("First Atlantic") under which First Atlantic was to extend loans to Pine Belt's customers to facilitate automobile purchases. (Compl. ¶ 17.) William Thomson ("Thomson"), Pine Belt's credit manager, was the primary liaison between Pine Belt and First Atlantic. (*Id.*) Thomson convinced his superiors to make the initial loan payment to First Atlantic on behalf of the Pine Belt customers who financed their purchases through First Atlantic. (*Id.* ¶ 19.) According to Thomson, this method would help Pine Belt customers, who had poor credit ratings, to secure loans. (*Id.*) Additionally, Thomson convinced his superiors that it was not necessary for Pine Belt to keep a record of these initial loan payments. (*Id.*)

Thomson allegedly used this scheme to embezzle approximately $800,000 through the

conversion of money orders between October 2003 and June 2005.[1] (*Id.* ¶ 22-23.) According to Pine Belt, Thomson requested checks from Pine Belt's accounting departments made payable to Commerce Bank. (*Id.* ¶ 20.) The requests corresponded to the initial loan payment Pine Belt purportedly made to First Atlantic on behalf of its customers under the Dealer Agreement. (*Id.*) Thomson would place the signed check in a batch with similar checks. (*Id.*) The batch of Pine Belt checks was then brought via messenger to Commerce Bank and individually exchanged for blank money orders in the exact amount of each check. (*Id.*) The blank money orders were then returned to Thomson who converted them to his own use instead of forwarding them to First Atlantic. (*Id.*) During the course of his scheme, he made the money orders payable to himself, his wife, his own financial company, and others, including some First Atlantic employees. (*Id.* ¶ 21.) Pine Belt eventually discovered the scheme in May 2005. (*Id.* ¶ 31.)

Meanwhile, Thomson was also engaged in the practice of falsifying credit applications and reports. (*Id.* ¶ 24.) Thomson misrepresented the creditworthiness of some customers thereby inducing First Atlantic to issue loans to customers who would not ordinarily have met its credit standards. (*Id.*) Thomson's fraud was eventually discovered after several auto loans went into default. (*Id.*) On April 13, 2005, First Atlantic demanded that Pine Belt reimburse it for losses on twenty-seven defaulted auto loans that were issued based on fraudulent credit information submitted by Pine Belt. (*Id.* ¶ 26.) Several days later, Pine Belt wire transferred $471,684.96 to First Atlantic as a good faith payment. (*Id.* ¶ 27.) On April 22, 2005, First Atlantic demanded payment on nineteen additional defaulted loans, which Pine Belt refused to pay. (*Id.* ¶ 28.) The

---

[1] From October 2003 through June 1, 2004 Thomson converted approximately $550,000 of money orders and from June 1, 2004 through June 1, 2005 Thomson converted an additional $235,580. (Compl. ¶ 22-23.)

following day, Thomson admitted that he was the primary person responsible for submitting the fraudulent credit reports and applications.[2]  (*Id.* ¶ 29.)

On May 27, 2005, Pine Belt notified Royal and Granite State that it had discovered an incident of employee theft and that the initial loss may be approximately $900,000.  (*Id.* ¶ 33.)  Pine Belt subsequently filed a proof of loss with both insurance companies on March 28, 2006.  (*Id.* ¶ 39.)  Royal declined coverage claiming that the loss was not discovered by Pine Belt within the extended period to discover loss after termination of the policy.[3]  (*Id.* ¶ 41.)  Granite State determined that the losses sustained by Pine Belt were part of a single occurrence that was subject to the $100,000 per occurrence limit and therefore declined to cover Pine Belt's total loss.  (*Id.* ¶ 60-61.)  In June of 2005, Pine Belt and First Atlantic entered into an arrangement for the disposition of automobiles that served as security on the defaulted loans.  (*Id.* ¶ 34.)

**C. Procedural History**

Pine Belt filed its complaint on December 12, 2006.  Pine Belt alleges that Granite State breached its insurance agreement when it (1) declined to cover the full amount of loss due to Thomson's theft through the conversion of money orders; and (2) rejected coverage for the losses sustained as a result of the submission of false credit reports.  Granite State filed this motion for summary judgment arguing, *inter alia*, that: (1) the embezzlement of money orders constitutes a single occurrence under the policy; (2) any loss related to the submission of false credit

---

[2] Thomson also identified two former Pine Belt employees who were involved in the false credit report scheme.

[3] Royal's policy provides: [w]e will pay for loss that you sustained prior to the effective date of termination or cancellation of this insurance, which is discovered by you no later than 1 year from the date of that termination or cancellation.

applications is not covered and/or is excluded by the policy because those "dishonest" acts do not constitute employee theft; and (3) there is no coverage under the Truth in Lending provision of the Garage Policy Extension Endorsement because Thomson's actions were dishonest, fraudulent, criminal and/or intentional.

## II. DISCUSSION

### A. Standard of Review

A court shall grant summary judgment under Federal Rule of Civil Procedure 56(c) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, *supra*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a

genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

**B.     Analysis**

The Court begins its analysis by stating the basic proposition that "when interpreting an insurance policy, courts should give the policy's words their plain, ordinary meaning" as long as the policy, as written, is not ambiguous. *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d. Cir. 2006) (internal citations omitted). "[I]n the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability." *Longobardi v. Chubb Ins. Co.*, 121 N.J. 530. Courts should refrain from reviewing extrinsic evidence unless an ambiguity exists. *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238 (2008).

> *1.     The conversion of money orders constitutes a single occurrence under the employee theft provision of Granite State's Commercial Crime coverage.*

Granite State argues that the losses resulting from the conversion of money orders are all part of the same ongoing embezzlement scheme and therefore constitute a single occurrence. Pine Belt responds by asserting that summary judgment is not appropriate at this time because additional discovery may reveal that Thomson batched and cashed the money orders several times, thus signaling multiple occurrences.[4]

The Granite State policy defines "occurrence" as "all loss caused by, or involving, one or

---

[4] Pine Belt also argues that additional discovery may reveal that more employees were involved in the scheme. This does not affect the Court's analysis since, according to the policy language, a single occurrence may involve one or more employees.

more 'employees' whether the result of a single act or series of acts." The Third Circuit stated that "the general rule is that an occurrence is determined by the cause or causes of the resulting injury." *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982); *see also Bomba v. State Farm Fire & Cas. Co.*, 379 N.J. Super. 589, 595 (App. Div. 2005) ("for the purpose of counting the number of occurrences, the term must be construed from the point of view of the cause or causes of the accident rather than its effect.") (quoting *Doria v. Ins. Co. Of N. Am.*, 210 N.J. Super. 67, 72-73 (App. Div. 1986)). Under this analysis, a court should ascertain whether "there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damages." *Id.*

In applying this test, the Court finds that the injury sustained from the conversion of money orders stems from a common cause - the ongoing embezzlement by Thomson. The Court finds it irrelevant whether or not Thomson may have batched and cashed the checks several times. As discussed below, even if there were multiple instances, each instance was related to the overall scheme to embezzle money from Pine Belt.

Pine Belt also argues that *Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc.*, 181 N.J. 245 (2004) is instructive in defining occurrence. In *Auto Lenders*, a car dealership employee submitted altered credit reports to a financial institution in order to secure loans for customers who were not creditworthy. *Id.* at 250-51. During the course of the fraud, twenty-seven falsified credit reports were approved. *Id.* at 251-54. This enabled twenty-seven different automobile sales, that otherwise would not have occurred, to occur. *Id.* Gentilini sought coverage for its losses under the

*employee-dishonesty provision* (not an employee theft provision) of its insurance policy.[5]  *Id.* at 255. The New Jersey Supreme Court determined that the employee's fraud "did not involve a 'single act or series of related acts,' but were distinct sales to separate purchasers, for separate automobiles." *Id.* at 277.  The court, therefore, concluded that each automobile sale represented a separate occurrence because the purchasers and the terms of each sale were unique.  *Id.*  Notably the court stated that it was "not persuaded that this case is analogous to ... any of the myriad of embezzlement-type cases where an employee steals cash or checks from an employer as part of an ongoing scheme to defraud."  Although this statement is dicta, the Court finds it to be a helpful insight into how the New Jersey Supreme Court would define occurrence in the context of an ongoing embezzlement scheme such as the one presented by the instant case.

The Court does not find the term "occurrence" to be ambiguous as written in the policy. After applying the Third Circuit's test and considering the New Jersey Supreme Court's statement in *Auto Lenders*, the Court concludes that Thomson's embezzlement scheme constitutes a single occurrence under the policy.  Thus, there is no genuine issue of material fact as to the number of occurrences.

    2.    *The loss sustained by the submission of false credit reports is not covered under the terms of the Granite State policy.*

Pine Belt contends that the loss sustained through Thomson's submission of false credit reports to First Atlantic should be covered under the Granite State policy through either the employee theft provision or the employee dishonesty provision.  The Court finds that this loss is not covered

---

[5]The policy at issue in *Auto Lenders* provided that "[a]ll loss or damage: (1) [c]aused by one or more persons; or (2) [i]nvolving a single act or series of related acts; is considered one occurrence." *Auto Lenders*, 181 N.J. at 275.

under either provision as a matter of law.

First, the Granite State policy defines theft as the "unlawful *taking* of 'money,' 'securities,' or 'other property' to the deprivation of the insured." (emphasis added) Few courts have addressed the meaning of "taking" in this context. Plaintiff argues that *Auto Lenders* is instructive in defining employee theft. However, in *Auto Lenders*, the New Jersey Supreme Court was tasked with interpreting coverage under an employee dishonesty provision. That case did not decide which actions constitute theft under an insurance policy that defines theft as an unlawful "taking". The instant case is more analogous to *Williams Electronic Games, Inc. v. Barry*, where the Northern District of Illinois concluded that losses incurred by an employer as a result of an employee's bribery scheme were not covered under a Crimeguard Policy. 2000 WL 106672, at *1 (N.D. Ill. Jan. 13, 2000). Specifically, the court determined that bribery did not constitute theft because it was not an unlawful "taking" under the policy. *Id.* The court went on to note that even if the employer was required to pay the victim of the bribery scheme the gross profits made pursuant to the scheme, the loss would not amount to a "taking." *Id.* Likewise, the loss that Pine Belt sustained when it reimbursed First Atlantic for the defaulted loans is not a "taking" and therefore not a theft under the terms of the policy.

Second, Pine Belt's policy language specifically excludes losses stemming from employee dishonesty.[6] Pine Belt argues that it believes it purchased employee dishonesty protection based on

---

[6]Pine Belt also argues that Granite State had never previously disclaimed coverage for losses sustained from Thomson's dishonesty until this motion was filed and therefore Granite State is estopped from denying coverage. Under New Jersey law "coverage provided by an insurance policy [cannot] be expanded by either waiver or estoppel" unless the insured detrimentally relies on the words or conduct of the insurer. *Greenberg & Covitz v. Nat'l Union Fire Ins. Co.*, 312 N.J. Super. 251, 265-66 (App. Div. 1998). The Court finds that Pine Belt has not demonstrated any reliance on Granite State's previous position. Moreover, as discussed

its prior relationship with Royal and its insurance broker, however the language of the policy states otherwise.  "Although courts should construe insurance policies in favor of the insured, they 'should not write for the insured a better policy of insurance than the one purchased.'" *Longobardi*, 121 N.J. at 537 (quoting *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 116 N.J. 517, 529 (1989)).  The Court finds that although Thomson's acts may have been dishonest, the losses resulting from his acts are not covered under the unambiguous terms of the policy as a matter of law.[7]

       *3. There is no coverage under the Truth in Lending provision in the Granite State Policy for the losses incurred by the submission of false credit reports.*

If Thomson negligently submitted false information on the credit reports, Pine Belt would be covered under The Truth in Lending provision in the Granite State Policy.  As such, Pine Belt argues that more discovery is needed to determine whether or not Thomson acted negligently when he submitted the credit applications to First Atlantic.  Specifically, in its opposition brief, Pine Belt cites to several instances where Thomson may have mistakenly provided incorrect social security numbers on credit applications.

Discovery is closed and Pine Belt has not submitted additional information proving that Thomson acted negligently rather than intentionally.  For the reasons set forth below, the Court finds that there is no genuine issue as to whether Thomson's actions were in fact negligent.  First, in the complaint Pine Belt stated that "Thomson admitted that he had been the primary person responsible for the fraudulent Credit Bureau reports and applications that had been submitted to the Credit Union

---

below the plain language of the policy excludes losses sustained from employee dishonesty.

 [7]The Court does not dispute that the conversion of money orders constitutes theft under the policy.  However, as discussed above, the scheme is a single occurrence and thus is subject to the $100,000 cap.

[First Atlantic]." (Comp. ¶ 29). Additionally, Pine Belt acknowledged that Thomson paid First Atlantic employees who participated in the scheme which refutes the suggestion that his actions may not have been intentional. (Comp. ¶ 29-30). Furthermore, in the proof of loss submitted to Granite State, Pine Belt stated that "Thomson . . . deliberately altered and falsified credit reports of prospective purchasers of automobiles." (Carlin Opposition Affidavit, Ex. CC, Proof of Loss, II). Finally, in response to an interrogatory, Pine Belt answered that "Thomson . . . engaged in the unlawful practice of altering and/or falsifying the applications and credit reports of customers that were submitted by Pine Belt Automotive to First Atlantic." (*Id.*, Ex. K, Answer No.1 at 5). As such, there is no coverage under the Truth in Lending provision.

### III.    CONCLUSION

For the reasons expressed above, the Court grants Granite State's motion for summary judgment with respect to the claims asserted against it by Pine Belt. An appropriate order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: October 21, 2008